# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NAB Holdings, LLC, a Michigan
Limited Liability Company

    *Plaintiff*,

v.

CloudMyBiz, Inc., a California
Corporation

    *Defendant*.
_____

Case No. _____

Hon. _____

**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY DEMAND

Plaintiff NAB Holdings, LLC ("NAB" or "Plaintiff"), by its attorneys Honigman LLP, brings its Complaint against CloudMyBiz, Inc. ("CMB" or "Defendant"), as follows:

## NATURE OF THE ACTION

1. This is an action against CMB for breach of contract and fraudulent inducement due to CMB's material misrepresentations and failure to develop, deliver, and implement the software and application contemplated by the Master Services Agreement between NAB and CMB entered into January 6, 2017 and the amended Master Services Agreement entered into February 2, 2017 (the

1

"Agreement") (attached as Exhibit A and B, respectively), the Project Plan executed January 12, 2017 (the "Plan") (attached as Exhibit C), and the Statement of Work executed January 30, 2017 (the "SOW") (attached as Exhibit D) and all additional Statements of Work, Change Orders, and working agreements discussed below (attached as Exhibit E) (collectively, the "2017 Contract").

2. NAB is a leader in the payment technology industry providing payment solutions to more than 350,000 businesses across the United States and Canada.

3. NAB processes more than $50 billion in transactions each year.

4. CMB is a consulting firm operating salesforce implementation technology services–assisting businesses in consolidating their various operating systems into one cohesive system and developing custom applications tailored to the businesses' specific needs.

5. CMB holds itself out as a "leader in the world of cloud based technology solutions," indicating on its website that it "specializes in Salesforce Implementation, migration, integration, development, … working with Third Party Applications and Custom App Development." Most notably CMB states that for businesses in the financial sector CMB offers Fundingo, "one of the most powerful tools in the alternative lending industry." Fundingo is a "loan management solution that streamlines the entire process of originating, underwriting, and

servicing loans."[1]  *See* Exhibit F (website).

6. NAB had previously worked with CMB in 2015 to improve its loan underwriting system and procedures. The project was completed under the management of CMB consultants Jordan Friedman, Abraham Vargas, and Jeff Morgenstein.

7. After several site visits and representations by CMB about personnel, industry knowledge and technical capabilities, NAB entered into the 2017 Contract with CMB for the creation of a custom software application and new software that would better streamline and manage its business practices and provide better support for its growing business.

8. Contrary to CMB's claims, CMB does not have adequate personnel with the required skill and experience to fulfill the promises made in the 2017 Contract nor has CMB appropriately allocated its staff to complete the tasks outlined in the 2017 Contract.

9. After months of working with CMB to launch the software and custom application, months of delays, multiple project teams, and a never-ending cycle of excuses and inadequate solutions from CMB, NAB has yet to receive the software and applications required under the 2017 Contract.

10. Consequently, NAB was required to expend significant time,

---

[1] Available at https://www.cloudmybiz.com (and various subpages).

3

resources, and personnel to minimize critical mishaps with the software and application received and CMB's suggested workarounds continue to present more issues. Indeed, NAB's personnel were required to, at times, train CMB's personnel on the technical and industry experience that CMB claimed that it had.

11. Moreover, NAB was required to migrate back to its legacy system to mitigate the damages that CMB's software and application were causing to NAB's reputation and customers.

## PARTIES

12. NAB Holdings, LLC is a Michigan limited liability company with its principal place of business at 250 Stephenson Highway, Troy, Michigan 48083.

13. Upon information and belief, Defendant CloudMyBiz, Inc. is a California corporation with its principal place of business at 15250 Ventura Boulevard, Suite 1111, Sherman Oaks, California 91403.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over all claims herein pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs exceeds $75,000.

15. This Court has personal jurisdiction over CMB because: (a) CMB engages in substantial business in this District; (b) CMB availed itself of

jurisdiction in this District by negotiation and performing the parties' 2017 Contract in this District; and (c) CMB's breach of the 2017 Contract causes injury to the Plaintiff in this District.

16. Upon information and belief, CMB negotiated and executed the 2017 Contract in Michigan. CMB also traveled to Michigan on numerous occasions in connection with the development and implementation of the software and applications contemplated in the 2017 Contract. These dates include at least May 8-9, 2017, November 27-30, 2017, September 4-6, 2018, and October 1-3, 2018.

17. Venue in this Court is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and for the reasons set forth above.

18. Pursuant to Section 13.7 of the Agreement, the laws of the State of California shall govern this action.

## FACTUAL BACKGROUND

### *NAB's Business and Original Operating System*

19. Since 1992 NAB has been committed to providing banking, loan, and credit card processing services.

20. As NAB began to expand, NAB discovered a number of challenges with its legacy software system including the inability to efficiently process the volume of transactions NAB completes daily.

21. NAB decided it was in its best interest to upgrade its operating system

and software.

22. Around the same time, CMB approached NAB and pitched the idea of NAB licensing CMB's salesforce and cash advance services.

23. CMB promised NAB that implementing its services would "significantly cut down on rework [time], [produce] more accurate report[s] to accounting, [and create] a scalable system for continuous growth." *See* Exhibit C at 3.

24. NAB previously partnered with CMB in 2015 and received superb results. Therefore, NAB decided to engage CMB for the development and implementation of its new finance and loan service software and application.

### *The Initial Agreement*

25. NAB identified specific requirements for the application and software it was requesting. This included a management system that included syndication, loan renewals, repayment, disbursement, commissions, and automated accounting data and reporting.

26. These requirements, among others, were made clear to CMB and detailed in the Plan.

27. In November 2016, CMB presented an overview of the project's timeline, goals, and the Plan at CMB's on-site visit to NAB in Michigan.

28. CMB assured NAB that it possessed the specialized industry and

technical knowledge, skill, and personnel to create the system that NAB needed, promising that it could create a system that exceeded the capacity of NAB's current system, a new system that "streamlined and automated processes, enhanced reporting, and maximized ROI while minimizing turnaround times to help fund more deals." *See* Exhibit C at 3.

29. Based on NAB's past relationship with CMB, NAB believed CMB's representations were reliable.

30. Additionally, NAB took steps to confirm that the project managers from their previous project with CMB (Jordan Friedman, Abraham Vargas, and Jeff Morgenstein) would be the project managers assigned to the new project because the three previous project managers allegedly had extensive experience within the lending and finance industry.

31. CMB project managers were responsible for on-site visits, authoring of requirements, and system design and NAB was aware that the previous project managers were CMB's experts on the finance and lending industry.

32. CMB confirmed that Jordan Friedman, Abraham Vargas, and Jeff Morgenstein would be involved with the project.

33. Based on CMB's representations, on January 6, 2017, NAB entered into a Master Services Agreement with CMB. Within 30 days, NAB and CMB amended that agreement, which also added an escrow provision. The parties then

7

executed the final Master Services Agreement on February 2, 2017.

34. In the Agreement, CMB represented and warranted that "[a]ll Services performed [under the Agreement would] be performed in a professional, efficient, and workmanlike manner in accordance with industry standards," and that CMB would "use personnel of required skill, experience, and qualification in performance of the Services." *See* Exhibit B, Section 7.1.

35. Section 6.2 of the Agreement required CMB to establish an escrow account containing the technical and other information necessary for NAB to complete, modify, or maintain the software and application. The section also requires CMB to make a one-time contribution of $3,000.00 to the escrow account for the establishment and maintenance of the account. *See* Exhibit B, Section 6.1-6.2.

36. Section 6.2 also states: "Within ninety (90) days after delivery of the Application to Client and thereafter within ninety (90) days of providing to Client any updates, fixes, or Enhancements … CloudMyBiz shall place a copy of the Escrow Materials as it appears in the Application in an escrow account." *See* Exhibit B, Section 6.2.

37. The project's needs and timeline was furthered executed by NAB and CMB in the Plan dated January 12, 2017.

38. The SOW dated January 30, 2017, outlined the cost of the project.

CMB budgeted that the completed project would take around 2200 hours and cost $338,400.

39. The Plan further outlined the customization of CMB's Fundingo and Salesforce software to best fit NAB's specific needs.

40. Viewing CMB as the specialist, NAB agreed with the recommendations provided and gave CMB the green light to begin production.

### *CMB's Excessive Turnover in Personnel*

41. In April 2017, CMB began to encounter a number of challenges to the project plan. As a result, CMB proposed to NAB a new project plan and Statement of Work, both dated April 5, 2017. NAB accepted the second plan and Statement of Work.

42. In September 2017, Jordan Friedman, Abraham Vargas, and Jeff Morgenstein departed CMB. This placed NAB without its project managers Vargas and Friedman, the primary architect behind the project, Morgenstein, and without the expertise NAB had bargained for when entering the 2017 Contract.

43. CMB assured NAB that the change would not cause any setbacks with the project and a new team would immediately come on board.

44. Within months CMB lost five more consultants bringing the total to eight team members gone.

45. CMB then brought on board a new offshore developer to serve as the

new project manager. However, the developer had no experience in banking or the loan industry.

46. As a result, NAB needed to bring the developer to NAB's site for training on various aspects of the industry at NAB's expense.

47. CMB again promised NAB that solutions were on the way. To compensate NAB for the difficulties, CMB again reduced the service rate and executed the third Statement of Work.

48. In May 2018, CMB removed the offshore developer/project manager from the project, leaving NAB with no project manager. NAB expressed concern to CMB, and CMB confirmed the project would continue moving forward and provided NAB with a discount on CMB's hourly rate moving forward.

49. Yet, after CMB missed numerous deadlines, NAB performed an audit on all the JIRA tickets that CMB had marked as "Completed." Based on the audit, NAB found that less than 30% of the items were actually completed and functioning within the Salesforce system. There was no demonstrable work done for the other 70% of the completed tickets, which then needed to be re-worked by CMB.

50. CMB and NAB then entered into yet another working agreement reducing the service rate from $135 per hour to $125 per hour. CMB then assigned yet another Project Manager to lead the project. This third project manager had no

lending and finance industry experience and his prior work was in the entertainment industry.

51. Section 7.1 of the Agreement required that CMB perform in a "professional, efficient and workmanlike manner in accordance with industry standards" and "use personnel of required skill, experience and qualification" and "devote adequate resources to fulfill its responsibilities under this Agreement." *See* Exhibit B Section 7.1

### *Implementation of the Software*

52. In addition to failing to have adequate personnel, CMB also failed to meet several of its development deadlines, resulting in the rescheduling of the anticipated Go-Live date for the software and application.

53. Go-Live dates were projected for: January 31, 2018, March 31, 2018, May 31, 2018, July 4, 2018, and August 1, 2018.

54. CMB failed to meet each of the launch dates.

55. In September 2018, CMB finally delivered the software and applications to NAB. The software and applications went live on September 5, 2018.

56. NAB soon discovered that the software and application were riddled with errors and nonconformities.

57. The errors included, but were not limited to, the software's failure to

11

retain data, frequent crashes, inaccurate calculations, manual data entry for reports instead of automated functions as requested, and an inability to produce real-time data.

58. Section 2.4 of the Agreement states that upon "written notice of rejection due to nonconforming software or applications, CMB would "use its best efforts, and at its own cost and expense, to perform such corrective action in order to correct the Nonconformity as promptly as commercially possible." *See* Exhibit B Section 2.4.

59. Pursuant to Section 2.4 of the Agreement, NAB immediately brought the issues to CMB's attention through multiple emails outlining the problems.

60. CMB promised that all the errors could be fixed and any missing functions implemented.

61. After several attempts at fixing the software and application, CMB began to prescribe workarounds to correct errors instead of addressing the underlying causes of the problems.

62. Within weeks NAB again identified more errors with the software and application including record locks during the funding process, automation process unable to function with users logged in, inaccurate disbursement, collections, and repayment calculations, syndication receivables failing to create, CPU Timeout/APEX error when updating payments, and error notifications failing to

send to users.

63. On May 8, 2018, NAB performed a JIRA audit and discovered that almost 30% of the application and software functions were nonconforming and another 30% of the functions, although marked completed by CMB, had not been demonstrated to NAB in order to be marked as functional.

64. Again CMB promised solutions. But, most solutions implemented by CMB were only temporary fixes and resulted in other problems surfacing. Some workarounds suggested by CMB were inappropriate for NAB's business or nonsensical.

65. Examples of CMB's proposed solutions that were inappropriate or nonsensical include, but are not limited to:

- manually disabling automation triggers;
- manually entering data;
- changing the timing for generating particular reports and running one report at a time; and
- ignoring the data reports from the financial system.

66. NAB also ran parallel production systems-its legacy system and CMB's new system. The outcome consistently showed that CMB's system produced unreliable data even when computing basic operations.

### *CMB has Exhausted Its Options and Time to Cure Its Breach*

67. NAB was left with no choice but to migrate all of its services back to its legacy system.

68. The crucial errors with CMB put NAB's business reputation at risk and resulted in NAB paying over $500,000 for the software and application and $250,000 to continue licensing its legacy software.

69. The escrow account required by Section 6.2 of the Agreement was never established by CMB.

70. NAB would not have engaged CMB for the project had it known that CMB did not have the expertise or personnel required.

71. NAB would not have continued to amend the 2017 Contract if CMB had not continuously represented that it was on the verge of solutions that would alleviate all the problems with the software and application.

72. Pursuant to Section 12.2 of the Agreement NAB notified CMB of CMB's material breach of the 2017 Contract. Under the Agreement, CMB had 20 days to cure its breach.

73. NAB provided CMB multiple notices including letters sent to CMB on December 27, 2018, January 7, 2019, February 6, 2019, and March 19, 2019. To date, CMB has not cured its breach.

74. After the loss of several key personnel including the initial project

managers, the project began to unravel and CMB could not uphold the promises it made to NAB.

75. Because of the loss CMB knew or had reason to know that it did not have the capability to develop, deliver, and implement the products it promised – and, worse, CMB continued to make excuses and provide failed workarounds that cost NAB a significant amount of time, resources, and personnel.

76. NAB has paid the licensing and service fees required by CMB and has received nothing of value.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

77. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-76 as if fully set forth herein.

78. The 2017 Contract entered into between NAB and CMB is a valid and binding contract.

79. As discussed above, CMB in connection with the 2017 Contract bargained for and made promises to NAB about the products it could develop.

80. NAB has satisfied all its obligations under the 2017 Contract.

81. CMB has failed to perform the services under the 2017 Contract.

82. CMB has materially breached the 2017 Contract by failing to deliver the custom application and software contemplated and by failing to create the

15

required escrow account.

83. The application and software delivered to NAB was riddled with errors. The application requires more than two hours to generate payments to syndicators, CPU Timeout/APEX errors occur when updating payments, record locks are experienced during the funding process, the automation processes are unable to function when users are logged in, the disbursement, collections, and repayment calculations are inaccurate, the system fails to create syndication receivables, and error notifications fail to send to users.

84. The application and software failed to satisfy the custom specifications set out in the Plan. Specifically, the application and software does not:

- Create syndication receivables when a user is funding an advance; Update payment statuses when generating over 10,000 partner payables;

- Notify users of errors or the system's failure to create records; nor

- Automatically complete the necessary steps to pay partners and adjust the payables data.

85. As a result of the errors, failures, and other conduct listed herein CMB has breached at least Sections 2.2, 2.4, 6.2, 7.1, and 7.2, of the Agreement. *See* Exhibit B.

86. As a direct and proximate result of CMB's material breaches of the Agreement, NAB has been damaged. NAB has had to delay its business operations, make costly deviations to address CMB's product deficiencies, and continues to pay licensing fees for its legacy system.

## COUNT II – FRAUDULENT INDUCEMENT

87. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-86 as if fully set forth herein.

88. CMB made numerous material misrepresentations to NAB.

89. CMB misrepresented its expertise and ability to perform pursuant to the terms of the 2017 Contract.

90. CMB misrepresented information to NAB vowing that its Fundingo software could be adapted to fit NAB's needs.

91. CMB's misrepresentations were false. As outlined in the facts above, CMB did not have the expertise, personnel, or skill to deliver the application and software described in the 2017 Contract or to fix the products errors that arose once the software and application was implemented.

92. CMB knew that its representations were false.

93. CMB knew that it was incapable of solving the problems with the custom application and software after the loss of several key personnel including the initial project managers.

94. CMB knew that it was incapable of completing the project when the continuous cycle of errors arose and CMB had to resort to workarounds and temporary fixes.

95. CMB recognized the software and application provided was deficient and its services inadequate.

96. Rather than admit its wrongs CMB proceeded by discounting NAB's fee rate and providing NAB with credits towards its balance.

97. CMB rate adjustments included the original rate of $150 an hour being adjusted to $135 an hour, then $125 an hour, and finally CMB charged a rate of $90 an hour.

98. With each rate change CMB represented that CMB could still produce the software and application contemplated in the 2017 Contract.

99. CMB intended NAB to rely upon its misrepresentations.

100. NAB did rely on CMB misrepresentations when selecting CMB for the project.

101. CMB provided NAB with the discounts and credits in an attempt to induce NAB to rely on its misrepresentations and continuously amend the 2017 Contract instead of terminating it.

102. NAB accepted the discount and agreed to amend the 2017 Contract multiple times, including revising the Master Services Agreement, executing three

additional statements of works, two project plans, a change order agreement, and a working agreement.

103.   As a direct and proximate result of CMB's material misrepresentation, NAB has been damaged. NAB has had to delay its business operations and believed CMB's misrepresentations to NAB's own detriment.

## RELIEF REQUESTED

Accordingly, NAB respectfully requests that this Court grant it the following relief:

    a. Enter judgement in NAB's favor against CMB in NAB's breach of contract claim;

    b. Enter judgement in NAB's favor against CMB in NAB's fraudulent inducement claim;

    c. Award NAB damages for CMB's multiple breaches of contract;

    d. Award NAB damages for CMB's fraudulent inducement;

    e. Award NAB all of its litigation expenses including attorneys' fees and costs as provided for by the Agreements;

    f. Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

NAB hereby demands a trial by jury on all claims so triable.

Dated: August 20, 2019						Respectfully submitted,

								HONIGMAN LLP

								By:  /s/ Christopher E. Hanba
								Christopher E. Hanba (P81732)
								Ka'Nea K. Brooks (P82092)
								315 East Eisenhower Parkway
								Suite 100
								Ann Arbor, MI 48108
								(734) 418-4278
								chanba@honigman.com
								kbrooks2@honigman.com

								*Counsel for Plaintiff*